Our first case today is MICROSOFT v. ITC. And we'll hear first from Mr. Trella. Thank you, Your Honor. Good morning and may it please the Court. Microsoft initiated this proceeding because Motorola's Android-based mobile devices incorporate basic technologies that Microsoft invented and patented and indeed, in some cases, originally licensed to Motorola. Four Microsoft patents are at issue in this appeal because the Commission concluded that the Motorola devices don't infringe those patents. With respect to three of them, the 376, 133, and 054 patents, the non-infringement decision really rests on claim construction mistakes. Now time won't permit me to talk about all of the patents, although I'm happy to address any questions the Court may have about any of them. I'd like to start by addressing the 376 patent because I think it's an example of the claim construction mistakes that led to the non-infringement findings. Can you talk, starting with the 376, but rather about the domestic industry issue where for that one and for the 762 or 672, you appear to require third-party software in order to meet the claims and the Commission basically found you didn't prove that. Right. I think there's a factual problem with the Commission's determination on that, which is, I think, where your question is going, Your Honor. And there's also an overarching legal problem, but let me start with the factual problem. First of all, with respect to the 054 patent, which you didn't ask about, the domestic industry and infringement determinations are basically one and the same. So if it infringes, then there's a domestic industry finding. For the 376, now the argument there was that Microsoft failed to show that the domestic industry products include the client applications required by the claims. They argued that Microsoft's expert didn't actually look at the domestic industry devices but just looked at Microsoft's source code and they point to testimony by Microsoft's 30B6 witness that the hardware manufacturers don't necessarily use all of Microsoft's source code in their devices. But in fact, what the record shows is that Microsoft's expert, Dr. Olivier, testified that he did examine devices loaded with Microsoft's Windows Mobile 6.5 operating system and he identified specific client applications. Now, as for the testimony about manufacturers not using all of Microsoft's source code, that testimony was directed specifically to the hardware-specific driver code that the Microsoft's 30B6 witness said the OEMs, the manufacturers, would use to be compatible with their own specific hardware. It had nothing to do with client applications. Pardon me, Your Honor. So I think it's just as a factual matter that determination is wrong on the 376. Now with the 762, again, Dr. Olivier analyzed Microsoft's source code and established that it practices the 762 patent when it's established on a mobile device. The argument there is that there's no evidence that the domestic industry products include the hardware-specific driver code from Microsoft's source code. Again, pointing to the same 30B6 witness testimony. But what the 30B6 witness said is that manufacturers include the driver code for their own specific radios in that device. In other words, they have their own hardware-specific driver code and Judge Essex, the ALJ, at Appendix 285 basically said the same thing. There's no requirement in the claims that the driver layer code be identical to Microsoft's source code. All it requires is that the device include hardware-specific driver code, and it does. It doesn't have to be Microsoft's hardware-specific driver code. The fact is that the device as a whole includes all of the claim limitations no matter what particular source it might have come from. Also as to that patent, Dr. Olivier specifically testified about an HTC device, the HD2, that he said includes the same, he analyzed the commands and said it's the same kind of thing that's in Microsoft's specific driver code. I mean, I remember that answer, and he said about the HTC device that it has certain commands working with the telephony radio, but there was nothing said there about whether the driver was hardware-specific. Is it wrong or right that every driver is hardware-specific? I assume not. Certainly the record doesn't say that it is. So that answer in which he immediately, the second or third or fourth sentences, he then goes on to talk about the Microsoft version. So he never actually says that while it has this Qualcomm radio in it, he says anything about the driver for that in that device. Well, I think that's a fair inference from his testimony because what he's talking about, it's undisputed that the Microsoft code includes a hardware-specific driver layer, and he's saying this code in the HTC device has the same kind of commands, functions in the same way. So I think it's a fair inference. You're right, he doesn't spell it out in exactly those terms, but I think it's a fair inference from his testimony. And also, again, going back to what the 30B6 witness said and what Judge Essex found, the manufacturers include hardware-specific driver code in their devices, and that's what the claims require. Could we talk a second about the technical prong of the domestic industry requirement? The statutory language says that the article must be protected by the patent. Correct. That language doesn't necessarily mean that it has to be claimed by, does it? Well, I think, Your Honor, it's all... You can be protected by even if the article does not actually incorporate the technology. Well, I think that's right. I think the statutory language is actually, when you parse the language, it's actually quite a bit broader than the commission... Related to. Yeah, related to and with respect to. You know, it doesn't say a domestic industry that sells and manufactures. It says a domestic industry related to investments with respect to. In other words, I could be a domestic producer, say I'm Microsoft, and I'm trying to sell my technology. I'm not making a product, but my technology is rejected by all U.S. consumers because they say, no, I'm buying it from abroad. Would that fit? And, of course, you would say, well, but my technology protects this area even if I'm not making a product. Would that trigger the technical prong of the domestic industry requirement? I think it would, Your Honor. How do you get around ALEC and Crocs? Both of those say differently than what I've just presented to you, as you know. Well, both of them say something different, but in a very different context. And I think if you look to the interdigital decision, which I think is this court's most recent pronouncement on the technical prong, as the court explains in interdigital, what ALEC and Crocs were talking about was a situation where the complainant relied on domestic manufacturer to try to establish the technical prong. And the court said, in that situation, you have to show that the product that you're manufacturing or the manufacturer which you're pointing to actually practices all the limitations, et cetera. As interdigital explains, the statute is actually quite a bit broader than that. And, in fact, the legislative history indicates, and it's consistent with the statutory text, that it was intended to protect industries that I think are exactly what Your Honor was describing. Have you presented this argument to us in a way that we can address? I think we have, Your Honor. I think it is laid out in both our opening and our reply briefs. Again, relying specifically on not only the language of the statute, but the interdigital analysis of the statute. And you don't think we need – you think we can address this, getting by ALEC and Crocs without going en banc? I do, Your Honor. Just as, for the very reason explained in interdigital, we were not – Microsoft was never relying on domestic production, the domestic production prong of the statute here, which is what Crocs and ALEC were talking about. It was relying on the 3C prong, which is engineering, research, and development, or licensing, which is what interdigital was all about. So I don't think there would be any need to go en banc to come out that way. Can I ask you a question, since time is short, about the first patent, the 054? Sure. Assuming, which I know you disagree with, that the claim construction adopted by the ALJ was right, do I understand right you have not, at least here, made the argument that the add, delete, change functions are infringing under that construction? Let me take a step back just to make clear what our position is. It's not just, and it's never been our position, that it's just the add, delete, change tag that is the resource data information. It's the entire sync command in ActiveSync, which includes sending the actual resource data along with the state tag. You need both, and that's the resource data information. We have not argued in this court that, if you take the kind of strict understanding of version that Judge Essex appeared to adopt, meaning document number such and such, version 2.0, 2.1, what have you, we have not argued that it includes that information. What we have argued is that it includes version information as it's actually used in the patent. The patent uses the term update version, which refers to the current condition, the current state of the resource at the time that the communication is going on between the mobile device and the server. So we do believe that the sync command in ActiveSync, which is what Motorola uses, conveys that kind of version information. But as far as the specific version number sort of information, no, we don't argue that. Or the somewhat softer version, if one interpreted what the ALJ said about the claim construction to mean providing information about the version, not some sort of absolute information about numbers, but relative information, namely this version must be newer than the one that the recipient of the message has, because that's why we're telling the recipient to do something with the version that the recipient has. Well, Your Honor, looking at the softer version that way, in fact, what the sync command does is it actually sends the modified resource and the tag that basically says, here's why this version, using it more generically, this version is different than what you had before. It either was added, deleted, or changed. So I think in that sense, in the softer sense of version, I think it does convey that. I guess that's the argument that I did not see in your brief here. Well, I think we made this argument, Your Honor, and again, it's because the resource data information in ActiveSync includes the actual resource data, and I think that combined with the tag that says what happened effectively gives version information. I see that I am well into my rebuttal time, so if the Court has no further questions, the only thing I would add is on the 376 patent, the ALJ, they're basically read in a requirement that there must be direct interaction between the notification broker and the data store. There is nothing clearly in the claim language, and in the specification, the argument was that there are no embodiments that showed anything other than direct interaction. Even if that were true, it wouldn't be enough to read a limitation into the claims, and all that shows is that there's no need for any intermediate component. There's no disclaimer and no reason. Even if we agree with you on that, how do we get around the client applications aspect of that same claim? There are two ways. Client applications being technically different from the notification broker. I think there are two ways you get around it, Your Honor. One is there's nothing in the claim language or the specification that says that a client application can't also be part of the notification broker, and the specification, when it talks about state change components and so on, and we lay that out in our brief, I think makes that clear. The other reason is that it's undisputed by either Motorola or the ITC that Microsoft identified at least one client application that is not even arguably connected, part of the notification broker, and if you read the language of claim, their argument is, well, you've got to have more than one because Claim 10 talks about client applications. In fact, if you really read through the claim, what the claim requires is that at least one client application register for notifications. It uses the plural clients in the more generic sense that you can have more than one, but all that's really required is one. So even under that claim construction, we think we established infringement. Thank you, Your Honor. All right, thank you, Mr. Trella. We'll give Mr. Trella back his rebuttal time, and would you give Mr. Verhoeven an additional five minutes if he needs to use it? That'll keep our time even. Mr. Verhoeven? Excuse me, we're going to start with Mr. Lieberman? Yes, I can. Okay, well then, Mr. Lieberman, you've got an extra five minutes. Okay, thank you, Your Honor. Good morning. May it please the Court, Michael Lieberman for the International Trade Commission. I would like to address the issues that were just discussed by Mr. Trella. And I will start with the domestic industry issue. In this case, Microsoft argued that the commission required domestic production of articles to show the existence of domestic industry. But that's not the case. The commission never required to show domestic production of the articles. Microsoft selected certain articles, such as smartphones, and Microsoft believed that it can show domestic industry based on those smartphones. Now, as a result, Microsoft was required to show that they were covered by these other patents. And Microsoft was not limited by the origin of these articles. In fact, when the ALJ analyzed the technical problem, he considered all the articles, even those that were manufactured abroad. So is that the difference? Is that the distinction? I didn't know whether that was what we were arguing about, whether or not the articles were... Well, Microsoft raised in both opening brief and reply brief this issue that it was required to show domestic production. In fact, it wasn't the case. Microsoft could and did rely on the articles that were manufactured abroad, third-party smartphones. So that's an initial issue. Now, Microsoft essentially, you know, failed to prove that those articles were covered by these other patents. I'm talking about three patents it issued, 0, 5, 4, 3, 7, 6, and 7, 6, 2 patents. And so after that, Microsoft now argues trying to avoid these consequences of failure of proof on the merits, that the complainant that relies on investment in exploitation of the patent under Section 37A, 3C may be excused from demonstrating that articles that a complainant relies on to demonstrate domestic industry actually practice the patent by which they claim to be protected. And that's not the case. Now, essentially this argument is inconsistent with both the statute and the interdigital decision. The court, in denying the case petition for a hearing interdigital, the court made clear that the requisite investments under Subsection 337A, 3C must pertain to the products covered by these other patents. And there is no exception to this rule. And subsequently, the court confirmed this position in its particular decision. So, essentially this leaves Microsoft with no support for its legal argument. Now, based on the kind of factual side of the case... Do you think the technical prong requires a petitioner to make an article that includes the patented technology? Not necessarily. Certainly not under Subsection A, 3C. In that circumstance, the complainant can rely on the exploitation of the patent. And that would include licensing, research and development. And in that case, there is no requirement to show that the complainant manufactures the products. But nevertheless, there is still a requirement to show that the articles protected by the patent actually practice the patent. So, under C, when you talk about substantial investment, are you talking about the economic prong or the technical prong? I am talking about the investments under C and the requirement for the technical prong in case where the complainant relies on investments under Subsection C. So there are obviously two different requirements, economic prong and technical prong. But when the complainant relies for the purpose of economic prong on Subsection C, there is no requirement to show that this complainant manufactures the product. But there is no exception for this complainant to show that there is a technical prong and it is satisfied. So, with respect to particular patents and with respect to particular findings of the ALJ... Can you address the 376 domestic industry issue? Sure. What was insufficient about their testimony on that one? With respect to 376, the major problem that contributed to Microsoft's fail of proof was that the devices analyzed by Microsoft's expert were not shown to practice the inventions claimed in 376 using the code developed by Microsoft. So, what happened... Do I remember right that their witness, I think Mr. Trella said this, asserted at least that he examines actual Windows phones and that they did have this on it. No specifics, but is it the absence of specifics that's the problem? Well, Microsoft... Well, what's lacking in the Microsoft's... What's lacking in this record, essentially, is Microsoft failed to demonstrate that the actual devices purported to show domestic industry in fact practiced the inventions disclosed in 376 utilizing actual code developed by Microsoft. So, there was always something missing. What was the something that was missing? If he analyzed the code, it would be an example code that was not shown to be implemented on particular devices. If he examined the device and he said, you know, I examined the device, it was loaded with Microsoft operating system, then there will be no testimony that particular code developed by Microsoft was actually implemented and utilized on this device and performing the functions that were claimed in the patent. For the 376, yes. Is it right that you don't need a third-party application? That is, it's possible that a phone manufacturer that loaded the entire Windows operating... Windows mobile operating system on it, that that system might have enough in it to meet the claims? Well, Microsoft relied... I don't think that's the case. Microsoft relied and actually provided the example code for every... for all the functions and all the levels of the invention claimed in this patent. But it was an example code. And therefore... And by the way, now Microsoft argues that the testimony that... this code wasn't used only applied for the lower level, which is the driver level. In fact, there was a record... I'm really not focusing on the 762 now. I'm trying to focus only on the 367. Okay. Well, in... as I said, in... 376. I'm sorry. Maybe that's my confusion. In 376, Microsoft had to show that its code actually was implemented and used. And the major... Just as a factual matter, if its entire example code was used, there would then be enough proof that the article... Well, if the expert would show that the code that initially was used as an example was actually used on the actual device. Right, that was the premise of the question. That would... And it was used for the purposes of implementing the... Right, so there are enough applications in there that if they were all put on there, they might satisfy. Right, but that was never the case. And that was the reason why the judge found that there is no proof. Now, 376 actually turns on plain construction of two major, most important for this patent terms. It's... And both of them were construed correctly by the judge. Now, there was an issue... Is there a requirement that the underlying driver have direct connection? Well, there are several reasons why that was actually the case. Well, one is it's consistent with the understanding of one of ordinary skill in the art. And that's consistent with the testimony provided by Dr. Alexander, who testified that a driver has a special meaning in the... This term has a special meaning in the field of computer science. And it's understood as interface that allows access to a particular device or specialized piece of hardware. Can you point us to anything in the specification that says there is a direct access? Well, first specification... Anything. Sure. Specification defines a notification broker as an underlying driver. Now, underlying driver, that's an indication that the lowest level, or at least the lower level, which leads or indicates the direct interaction with the underlying hardware. I don't think you're answering my question, are you? I ask you if there's anything in the specification that supports direct access. Well, if we're talking about specification, that would be the closest thing, I think. But there is other evidence in the record. Like, for example, Dr. Olivier, Microsoft expert, actually confirmed that the driver communicates directly with the hardware. And that's page 42620 of the Joint Appendix. That the driver in an accused product... Well, he was testifying about... What the claim... Accused products, right. Okay, so that's not what the claim requires. Well, but he used... That's not testimony about what the claim requires. It's testimony that's describing an accused product, which if the claim said, you can communicate any way you like, and one that did directly would certainly meet it, but it wouldn't exhaust the field. But his reasoning was based on the notion that the driver directly communicates with the hardware. And that was important for this testimony. That's why I quote these pages. They make it clear that Dr. Olivier understood the driver has a direct communication or direct interaction with the underlying... Can I ask you... Can I switch topics from one... Sure. Well, we can also speak to Mr. Verhoeven in a moment. And also, in the context of 762 patent, Microsoft was using this fact that driver has direct interaction to distinguish the prior reference of LUN. And that's on page 43555 through... Thank you, Mr. Lieberman. Let's hear from Mr. Verhoeven. Thank you. Good morning, Your Honors. May it please the Court? Why don't I pick up on notification broker in the construction? Start right there. If I may... Excuse me. I think it's helpful to look at the procedural history of this issue and then go into the answers to the questions that were being asked. There was a Markman hearing below, and at Markman, Microsoft argued for the construction of notification broker is simply, quote, software that manages notifications. My client argued for... that the term notification broker was defined in the specification. And if you look at the specification, it clearly was defined as, quote, the term... It says, quote, the term notification broker refers to an underlying driver responsible for, at least, adding, updating, and removing data from a data store. Then, after the Markman, for the first time, Microsoft tried to recapture its broad construction by arguing that... that the underlying... that a driver, an underlying driver could be basically any kind of software. It could have any kind of components in it. And the answer to your question, Judge Rader, is the word direct is not in the specification. And the reason it's not in the specification is because everybody in computer science knows what an underlying driver is. We presented evidence through the testimony of Dr. Alexander as to what the plain and ordinary meaning of driver software is. It's software that drives hardware. It's the lowest level software. In fact, we presented the example of a printer driver, and the whole purpose of driver software as people in computer science know is to abstract out from the specific software you need to drive different pieces of hardware. This enables computer... higher-level computer software to be much more efficient because it doesn't have to worry about the specific... hardware-specific driver software. It's abstracted out. So you can send something to all kinds of different printers without having to change your code each time. Right, but that by itself doesn't say that there isn't a stop between that driver and the thing being driven. A stop, that would mean it was not direct. All you've talked about is about the obvious usefulness of what's exposed on the top end. Right. And if you look at Dr. Alexander's testimony, which the ALG relied on... By the way, there was no corresponding testimony that conflicted with Dr. Alexander. Their expert did not contest that fact. He actually used the term once in cross-examination talking about underlying drivers below the operating system. You might have a trouble with this direct component which seems to be read in out of thin air. Talk a minute about the client application and the notification broker. Why can't those be the same? Well, a number of reasons. In other areas of technology, we've acknowledged that you can have a single component performing two claimed functions. Absolutely, Your Honor. But, of course, you always look at the specification to breathe life into the claims and the claims themselves. Certainly do. And here we're talking, we take a step back and let's talk about what is this invention about? Well, the problem that this invention addressed was you have these clients, multiple clients, and they all want to know, be informed about different changes in states of other components. So, I want to know when the battery's at 25% or I want to know something else. So, you have 100 changed state components, things that have states, and you have 100 clients. And if each of these clients want to get updates from the changed state components, it's really inefficient. You'd have a matrix of 100 different lines. And so, the alleged invention here is you have a centralized notification broker, and the notification broker keeps a register. And these clients register with the notification broker and this centralized broker then monitors the different changed states and if the battery gets to 25%, it looks at the register of all the clients that want to know when it's 25% and it pings them all. That's the whole description of the invention here. So, then when you go looking at the claims, every single time in the claims it's client applications plural. And it talks about client applications registering with the notification broker. It talks about it being coupled to the notification broker, all of which supports the construction that they have to be different things. So, yes, in the abstract, the proposition is absolutely correct, Your Honor. What do you do with that, the place in column 2, lines 45 to 48? You know what I'm talking about. The term client refers to any component which registers for state property change notifications. A client may be a state change component as well as state change component being a client. That's easy. That's easy, sure. Because I'm the battery application. That is a client, but it also is monitoring and managing a piece of hardware, the battery. And so it's both a client and a change state component. That is totally irrelevant to this centralized notification broker. So you have, you still have all these intersecting lines, but the purpose of the notification broker is to be separate from those things and be a centralized managing, place to manage. Also, I don't think that appears in the claims, Your Honor. But those are different things. A change state component is different from the notification broker. That's how I would answer that question. I would like to point out that Microsoft's expert on this issue admitted that they can't be the same. If I could just quickly read the Q&A on that question. But according to the patent, a client cannot be the same thing as a notification broker. Would you agree with that? Answer, clients register as a notification broker. Question, so they can't be the same thing as a notification broker. Answer, that's correct. And he admitted it also a separate time, which we've cited at A42628. So there really wasn't any dispute about this until it was raised on appeal. I mean, this was, both experts agreed on this. Before your time runs, oh, I'm sorry. You want to give us a brief summary of your view on technical prong and the outer bounds of interdigital? Yes, I would. The statute requires 33783 has the language with respect to the articles protected by the patent. I agree that with my, with ITC counsel on several of his statements, but I would like to make this point. Interdigital is a licensing case and licensing is completely different from research and development and other efforts. If you license a patent, you can show it's listed there and then you can basically, and you can show people are paying you money for that patent by selling products. It's a whole different analysis than if you're just talking about research and development. If you're talking about research and development, you have to show that the research and development, according to the statute, is with respect to the articles protected by the patent. If a single element of a claim that you're asserting that patent is not met, you are not, it is not with respect to articles protected by the patent. It's not. Otherwise, you change infringement law. You mean if a single element of a claim is missing, there's no infringement. And by definition... You're assuming that protection and infringement are completely coterminous then. I guess I'm interpreting it that way, Your Honor. I think that's the correct way to interpret it. Now, I don't know if I've been given more time. You have been, but we appreciate your comments. Thank you, Mr. Trelawney. Okay. Thank you, Your Honor. Mr. Trelawney, we've restored your rebuttal time. Thank you, Your Honor. Let me talk first about the 376 patent. Counsel acknowledged that they rely on extrinsic evidence. If you look at the expert testimony they're talking about, the word direct isn't anywhere in there either. So you went on that one. How do you get around the client applications? Well, Your Honor, I think we get around the client applications. Again, as I said in my opening, you only need one under the language of the claim and it's undisputed that there was at least one. The phone app, both Motorola and the ITC acknowledged that. Yeah, but Mr. Verhoeven had kind of a good point about that notification broker is a key element of the invention here and operates to make these client applications more efficient. Right. Oh, absolutely. It absolutely does. But that distinguishes client applications from notification brokers. I understand and I didn't make my point clear. My point is that it's undisputed that there's at least one client application that has no connection at all to the notification broker. It's not even alleged that it's part of the notification broker. That's the phone app. There are other client applications where they argue, well, you said it's part of the notification broker here and you said it isn't here. But as to that one, which is in the accused products, there's no dispute about that. Their only argument as to that is, well, you need more than one and I think if you look at the claim language, you clearly do not. So, you know, that's the problem they have there. On domestic industry, although client applications is plural, it is plural in part of the claim, but if you get down to where it really matters, that's my gloss on it, where it talks about what's registering for the notifications, which is what makes the whole thing work, it says at least one client application registers and then thereafter it talks about applications. I think it's just like in the Versa case, which we cited in our briefs, that the plural can mean one or more depending on the context. And here, that context is, we think, indicates one or more. On domestic industry, it's not our, it was not our argument that the commission erred because we were required to show domestic manufacture. In fact, Motorola had argued that below. That argument was rejected. And Mr. Verhoeven's argument about licensing being completely different from engineering and research and development, is just, it's not supported by the statutory text. Engineering, research, and development or licensing are together in one clause of the statute. Now what InterDigital held in looking at the licensing context, and InterDigital was a licensing case, it held that InterDigital didn't make any products, it didn't need to. The court also noted that the ITC had consistently held that the licensee doesn't need to actually make the products either. And you could still establish a domestic industry, there's no reason to treat licensing different from engineering, certainly no statutory reason to treat licensing different from engineering and research and development in the statute. The last point that I would like to make, oh, one other point on the 376 patent, and that's on the state change component point, I think, Your Honor, Judge Schroeder, you asked about. A state change component is defined to be any component that adds, updates, or maintains state properties in the data store. That's exactly what a notification broker does, and so it seems clear from the spec that you can have this overlap between something that can be a client application and also can be a part of the notification broker. The last point I would make is on the 054 patent. Judge Taranto, you had asked about Microsoft's argument about infringement given the claim construction and version and all that. I would just refer you to pages 15 and 16 of our reply brief. That's where we lay out the argument that I was trying to describe to you earlier. Thank you very much. Thank you, Mr. Petrola. Our next case...